# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3357 | **DATE** | 12/4/2000 |
| **CASE TITLE** | Lori Ann Kornely vs. Carson's Ribs of Deerfield, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 12/18/2000 at 9:00 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment (Doc. No. 14-1) is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | DEC 0 5 2000 date docketed | |
| | Notified counsel by telephone. | | | 23 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | FD-7 FILED FOR DOCKETING | 12/4/2000 | |
| | Copy to judge/magistrate judge. | 00 DEC -4 PM 5:33 | date mailed notice | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LORI ANN KORNELY,<br><br>Plaintiff,<br><br>v.<br><br>CARSON'S RIBS OF DEERFIELD, INC.,<br>d/b/a CARSON'S RIB PLACE, an Illinois<br>corporation,<br><br>Defendant. | No. 99 C 3357<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lori Ann Kornely ("Kornely") brought this action against her former employer, Carson's Ribs of Deerfield, Inc., d/b/a Carson's Rib Place, an Illinois corporation ("Carson's"), alleging gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Specifically, Kornely claims that Carson's fostered a hostile work environment by not taking prompt and effective action to prevent continuing sexual harassment by several of her co-workers, prompting her resignation. Although she has withdrawn any claim for back pay or lost wages (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 6), in this lawsuit she seeks damages for emotional distress and a temporary strain on her relationship with her boyfriend that she suffered as a result of the conduct of her co-workers.

Defendant has moved for summary judgment on two grounds. First, Defendant argues that summary judgment is proper because Plaintiff has failed to produce credible evidence of a hostile work environment other than her own uncorroborated testimony.



Second, Defendant argues that Plaintiff has failed to provide a basis for employer liability because she failed to bring the alleged conduct to management's attention. For reasons provided in this Memorandum Opinion and Order, Defendant's motion is denied.

## FACTUAL BACKGROUND

### A. Plaintiff's Failure to Comply with Northern District of Illinois Local Rule 56.1

Pursuant to Local Rule 56.1(a), the party moving for summary judgment must submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law" and a supporting memorandum of law. Loc. R. 56.1(a)(2), (3). Defendant provided a fully supported Local Rule 56.1(a)(3) statement of material facts in support of its motion for summary judgment, as well as an adequate supporting memorandum of law.

The non-movant, in turn, must reply with a "concise response to the movant's statement" and its own supporting legal memorandum. Loc. R. 56.1(b)(2), (3). This statement is to contain "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, *specific references to the affidavits, parts of the record, and other supporting materials relied upon.*" Loc. R. 56.1(b)(3)(A) (emphasis added). Moreover, the non-movant must also submit "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." Loc. R. 56.1(b)(3)(B). Most importantly, "all material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the

statement of the opposing party." *Id.*

Plaintiff's response to Defendant's motion is disappointing. First, the response is inadequate under Local Rule 56.1(b)(3). In response to several paragraphs of Defendant's 56.1(a)(3) statement, Plaintiff has responded, "Denied," but has furnished no specific citations to the record, as mandated by Local Rule 56.1(b)(3)(A). Second, the "memorandum of law" she filed pursuant to Local Rule 56.1(b)(2) contains not a single citation to any legal authority. Plaintiff has, however, filed a supplemental statement of material facts pursuant to Rule 56.1(b)(3)(B) with concise numbered paragraphs and citations to the record.

Ordinarily, "expressing disagreement with a fact contained in the movant's Rule 56.1(a)(3) statement without providing a citation to the materials supporting that dispute is . . . a basis for deeming the movant's factual assertions to be true." *Neilis v. Ward*, No. 98 C 5125, 2000 WL 1372870, at *2 (N.D. Ill. Sept. 21, 2000) (citing *Garrison v. Burke*, 165 F.3d 565, 567 (7th Cir. 1999)). Further, a Local Rule 56.1(b)(3)(B) statement of additional material facts submitted by a non-movant does not ordinarily serve as an adequate response to the movant's Local Rule 56.1(a) statement, because the 56.1(b)(3)(B) statement does not provide an appropriate forum to contest facts that should have been contested in the non-movant's Rule 56.1(b)(3)(A) reply statement. *See Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 689 (7th Cir. 2000). Under such circumstances, the court does not abuse its discretion in finding the movant's statement of material facts to be uncontested. *See id.* The Seventh Circuit has clearly stated that district courts may strictly enforce rules of procedure like Local Rule 56.1. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920-923 (7th Cir. 1994)

3

(discussing similar Indiana rule).

The district court does, however, retain discretion with respect to enforcement of these rules. *See Dade v. Sherwin-Williams Co.*, 128 F.3d 435, 440 (7th Cir. 1997); *Waldridge*, 24 F.3d at 923. Though it is "not required to engage in a treasure hunt to uncover the evidence a party relies on to demonstrate a material factual dispute or to establish the essential elements required to survive summary judgment," *Howse v. Northwestern Mem. Hosp.*, No. 98 C 4488, 2000 WL 764952 (N.D. Ill. June 13, 2000), the court has, of its own initiative, reviewed the comparatively slim record in this case. The basis for Plaintiff's factual disagreements can be discerned from her statement of additional material facts filed pursuant to Local Rule 56.1(b)(3)(B), which does refer to relevant portions of the record and supporting materials, when read in conjunction with the entire record. Therefore, to the extent they can be discerned, Plaintiff's statements filed pursuant to Local Rule 56.1(b) will be considered.[1] Plaintiff's counsel is cautioned to comply fully with the Local Rules in future dealings with this court.

B.  Statement of Material Facts

---

[1]  As such, the facts of this case are taken from Defendant's Rule 12(m) Statement of Undisputed Facts (hereinafter "Def.'s Facts"); Plaintiff's Response to Defendant's Rule 12(m) Statement (hereinafter "Plf.'s Response to Def.'s Facts"); Plaintiff's Supplemental Rule 12(m) Statement of Undisputed Facts (hereinafter "Plf.'s Additional Facts"); Defendant's Response to Plaintiff's Supplemental 12(m) Statement of Undisputed Facts (hereinafter "Def.'s Response to Additional Facts"); and from elsewhere in the record. Effective September 1, 1999, the Local Rules for the Northern District of Illinois were renumbered without substantive change. These mandatory statements now arise under Local Rule 56.1(a) and 56.1(b). *See Bommelman v. Transfer Print Foils, Inc.*, No. 97 C 2082, 2000 WL 816792, at *1 n.2 (N.D. Ill. June 22, 2000); Loc. R. 56.1(a)(3), (b)(3)(A)-(B).

Carson's is a family restaurant in Deerfield, Illinois. (Def.'s Facts ¶ 5.) Kornely began her employment as a waitress at Carson's on or about August 1, 1998. (Def.'s Facts ¶ 6). While Kornely was employed at Carson's, Barry Zirlin (hereinafter "B. Zirlin" or "Barry") and John Korellis (hereinafter "Korellis") served as managers, and Sandra Zirlin (hereinafter "S. Zirlin" or "Sandra") served as the assistant manager. (B. Zirlin Aff. ¶ 1, Ex. B to Defendant's Motion for Summary Judgment (hereinafter "Def.'s Motion"); Korellis Aff. ¶ 1, Ex. D to Def.'s Motion; S. Zirlin Aff. ¶ 1, Ex. E to Def.'s Motion.) Kornely remained employed at Carson's until September 12, 1998. (B. Zirlin Aff. ¶ 5.)

Carson's has a procedure for reporting incidents of sexual harassment in its restaurants. Donna Carson Giannis (hereinafter "Giannis"), the co-owner of Carson's, informed Barry, Sandra, and Korellis of Carson's sexual harassment complaint policy on several occasions over the past eight years. The managers were instructed that if an employee ever lodged a complaint or made an allegation of sexual harassment by co-workers, supervisors, or patrons, such allegations should be immediately investigated. (Def.'s Facts ¶¶ 10, 11.) Carson's also maintains an employee manual for its wait staff. This handbook provides an official procedure for an employee's filing of sexual harassment complaints. (Def.'s Facts ¶ 8; Ex. 1 to Korellis Aff., Ex. D to Def.'s Motion.) To facilitate the filing of complaints pursuant to Carson's policy, the company maintains blank "employee communication forms," gummed envelopes and a locked mailbox near the employee time clock in the kitchen area of the restaurant for employees to use to submit complaints to the owners. (Def.'s Facts ¶ 9.) The communication forms specifically state, "[i]f you feel there is a problem that [the owners]

should know about, or if you've voiced a grievance with a manager and the problem has not been remedied, then please take the time to fill out this form in detail . . . and drop it into the employee suggestion box." (Wait Staff Manual, at 12, Ex. 1 to Korellis Aff.)

Kornely was asked at her initial interview to review and sign a form acknowledging that she had received and reviewed Carson's wait staff manual. (Korellis Aff. ¶ 5.) Kornely admits that she signed this form, but does not remember specifically receiving the manual or reviewing it with Barry at the time she was hired. (Kornely Dep., at 30-31.) Kornely also denies any knowledge of the "employee communication forms" or a complaint box in the kitchen. (Kornely Dep., at 80.) It is undisputed that Kornely did not use an "employee communication form" to lodge a complaint with Carson's ownership or management concerning any incident of harassment during her time of employment. (Def.'s Facts ¶ 18.)

Beginning on or about August 18, 1998 and continuing for a period of approximately two weeks, Kornely claims that a busboy at Carson's named Alfonso repeatedly harassed her and inappropriately touched her by grabbing her behind approximately twenty times and placing his genital area on her behind at least three times. (Plf.'s Additional Facts ¶ 8; Kornely Dep., at 62-63, 79.) During this period, Kornely also alleges that Alfonso and a cook nicknamed "Skippo" made sexual gestures in Kornely's presence and joked about "taking her out to a van," sometimes speaking English and sometimes speaking Spanish. (Plf.'s Additional Facts ¶ 7; Kornely Dep., at 59.) Kornely did not take immediate action; she did not mention or allege any harassment or inappropriate behavior to Carson's management until August 28, 1998. (Def.'s Facts ¶ 12).

6

Carson's denies knowledge of the truth or falsity of these incidents involving Alfonso. (Def.'s Response to Additional Facts ¶¶ 7, 8; B. Zirlin Aff. at ¶¶ 5, 9; Korellis Aff. at ¶¶ 4, 9; S. Zirlin Aff. at ¶¶ 3,6.) Moreover, Kornely's fellow waitresses Corrine Benadi (hereinafter "Benadi"), Margaret Santi (hereinafter "Santi"), and Marlene Ruiz (hereinafter "Ruiz") submitted affidavits stating that they had not heard of the incidents, nor had Kornely brought them to their attention. (Benadi Aff. ¶ 6, Ex. F to Def.'s Motion; Santi Aff. ¶ 7, Ex. G to Def.'s Motion; Ruiz Aff. ¶ 5, Exhibit H to Def.'s Motion.)

Nevertheless, Kornely alleges that Carson's management did have knowledge of these incidents. On August 28, 1998, Sandra followed Kornely into the restroom at Carson's. (Def.'s Facts ¶ 13.) Sandra could see that Kornely was very upset. (S. Zirlin Aff. ¶ 6.) While in the bathroom, the two had a conversation. (*Id.*) Sandra claims in her affidavit that Kornely told her she was upset with her boyfriend Roger, as she suspected he was abusing her children while he watched them when she worked. (*Id.*) Sandra also states that Kornely never alleged or complained that Alfonso, or anyone else, had inappropriately touched or harassed her. (*Id.*) Kornely, on the other hand, testified to an entirely different story at her deposition. (Kornely Dep., at 65.) She claims that she told Sandra about the busboys, specifically that "they were pigs and they kept grabbing me and touching me, Alfonso, anyways." (*Id.*). In response to Kornely's statements, she testified that Sandra told her to "brush it off. Don't even worry about it. Just stay away from them . . . Just stay away from him." (*Id.*) Kornely further asserts that Sandra did nothing else following the conversation, (Plf.'s Additional Facts ¶ 11), but acknowledges that Sandra did move Kornely to the other,

7

more profitable side of the restaurant, at her request, for the remainder of that night. (Kornely Dep., at 65-66.)

Kornely next alleges that, on September 1, 1998, she went into the restaurant's cooler to retrieve supplies for the evening. (*Id.* at 54-55.) While she was in the cooler, the cook nicknamed Skippo approached her from behind and grabbed her breasts. (*Id.* at 55.) Kornely claims that she "open-handed slapped him on his chest" because she was so shocked by his actions. (*Id.*) Kornely admits that she did not mention the incident to the two managers on duty or to other co-workers that night. (Plf.'s Response to Def.'s Facts ¶ 19; Kornely Dep., at 56-58.) She did not tell anyone because she was too embarrassed, and "tried to block it right out in my head." (Kornely Dep., at 56-57.)

Again, Carson's denies knowledge of the truth or falsity of the cooler incident. (Def.'s Response to Additional Facts ¶ 5; Korellis Aff. ¶ 10; B. Zirlin Aff. ¶ 10; S. Zirlin Aff., ¶ 8.) Kornely's fellow waitresses Benadi, Santi, and Ruiz also state that they have not heard of the incident regarding Skippo, nor had Kornely mentioned it to them. (Benadi Aff. ¶ 7; Santi Aff. ¶ 8; Ruiz Aff. ¶ 6.)

Nevertheless, Kornely asserts that Korellis had knowledge of the incident. (Plf.'s Additional Facts ¶ 6.) On September 2, 1998, Kornely claims that Korellis confronted her regarding her slapping of Skippo. (*Id.*) At her deposition, Kornely stated that, when she arrived to report for her shift, Korellis was laughing at how hard she had hit Skippo, because her hand print was still on his chest. (Kornely Dep., at 56-57.) By this time she believed that the whole restaurant knew about the incident she had previously wanted to keep quiet, and

8

she was very embarrassed. (*Id.* at 57.) Kornely did not testify as to exactly what she said to Korellis about the Skippo incident. When Carson's counsel asked, "So the next day, you told Johnny [Korellis]. And you said," Kornely interrupted and responded, "He confronted me, actually, with it . . . ." Because Carson's counsel never fleshed out what "it" meant, the court is unable to determine that there is no dispute concerning Carson's knowledge of this alleged incident.

Following the incident with Skippo, Kornely claims Alfonso and another busboy, to whom she refers simply as "the little man with a mustache," continued to grab and kiss her. (Plf.'s Additional Facts ¶ 9.) Kornely also stated that "the little man with a mustache" kissed her on the back of the neck several times between September 10, 1998, and September 12, 1998. (Kornely Dep., at 76). On September 8, Kornely claims that she again complained about general harassment by the busboys to Korellis. (Plf.'s Additional Facts ¶ 12; Kornely Dep., at 70.) Carson's denies this: Korellis states that he has no knowledge of such a complaint (Korellis Aff. ¶¶ 4, 9, 10), and Barry and Sandra also state that Kornely never complained or notified them about a man with a mustache kissing her on her neck while she worked. (Def.'s Facts ¶ 16; B. Zirlin Aff. ¶ 9; S. Zirlin Aff. ¶ 6; Def.'s Response to Additional Facts ¶ 12.) Kornely admits that nobody other than Alfonso touched her between September 2, 1998 and September 8, 1998. (Plf.'s Response to Def.'s Facts ¶ 21).

Kornely resigned from Carson's on September 12, 1998. (Def.'s Facts ¶ 23.) Instead of reporting for her shift, she called Korellis at the restaurant and told him she was quitting without notice. (Def.'s Facts ¶ 23; Kornely Dep., at 53-54.) According to Kornely, she told

Korellis that she couldn't handle working at Carson's any longer, because the money was not worth the sexual harassment. (Plf.'s Additional Facts ¶ 2; Kornely Dep., at 42.) She also told Korellis that she was humiliated, that Carson's had known about the situation with Skippo a week earlier, and that nothing had been done about the co-workers grabbing her. (Plf.'s Additional Facts ¶ 4; Kornely Dep., at 53-54.) According to Kornely, Korellis responded by saying, "Well, if that's how you feel about it, fine." (Kornely Dep., at 54.) Finally, Kornely claims that she never told Korellis that her exclusive reason for resigning was because she needed to make more money. (Plf.'s Additional Facts ¶ 3; Kornely Dep., at 42.) Korellis, on the other hand, claims that the only reason Kornely mentioned for quitting was that she was not making enough money, (Def.'s Response to Additional Facts ¶ 3; Korellis Aff. ¶ 11), and that he did not learn of any incidents of harassment involving Kornely until this lawsuit was filed. (Korellis Aff. ¶¶ 9, 10, 11.)

Kornely admits that she seeks no damages caused by these events other than for humiliation, embarrassment, and a temporary impact on her relationship with her boyfriend. (Plf.'s Response to Def.'s Facts ¶ 25.) She did not seek or receive any counseling or medical treatment as a result of the sexual harassment. (Def.'s Facts ¶ 30.) Carson's maintains that Kornely's relationship with her boyfriend was already strained during her employment. Indeed, Kornely admits she did not tell her boyfriend about any of the incidents until September 12, 1998, the day she quit, for fear that Roger would be angry. (Kornely Dep., at 60.) Carson's notes, further, that throughout her employment, Kornely would often talk openly about her strained relationship with her boyfriend. At various points in time she told

10

Sandra, Benadi, Santi, and Ruiz that she feared her boyfriend was abusing her children while she worked. (Def.'s Facts ¶¶ 31, 34, 38, 40.) Kornely would on occasion discuss her problems with Roger to and in the presence of restaurant customers. (Def.'s Facts ¶ 35; Benadi Aff. ¶ 3.) Carson's reprimanded her once after a customer complained that she was discussing her personal problems with him. (Def.'s Facts ¶¶ 33, 35.)

Kornely brought this suit on May 20, 1999.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether any genuine issue of material fact exists, the court "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *See Michas*, 209 F.3d at 692 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). " 'A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.'" *Michas*, 209 F.3d at 692 (quoting *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999)).

### A. Presence of a Hostile Work Environment

A plaintiff can maintain a hostile work environment sexual harassment claim under Title VII only when the conduct is " 'sufficiently pervasive to alter the conditions of employment and create an abusive working environment.'" *Hostetler v. Quality Dining, Inc.*,

11

218 F.3d 798, 806 (7th Cir. 2000) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Determining whether harassment rises to this level involves the analysis of several factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hostetler*, 218 F.3d at 806-7 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993); *see also Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). A court must also address the impact of the harassment upon the plaintiff's work environment. *Hostetler*, 218 F.3d at 807. "The work environment cannot be described as 'hostile' for purposes of Title VII unless a reasonable plaintiff would find it offensive and the plaintiff actually perceived it as such." *Id.* Carson's argues that Kornely has failed to produce credible evidence that her work environment was hostile other than her own uncorroborated testimony. Upon a review of the record, the court finds that several issues of material fact exist concerning this argument.[2]

First, the record as a whole in this case, when viewed in the light most favorable to Kornely, could readily support the inference that she subjectively perceived her work environment to be hostile as a result of the harassment. Following two weeks of objectionable and inappropriate behavior of a sexual nature (Plf.'s Additional Facts ¶ 7),

---

[2] The Seventh Circuit has never required an employee's allegations of sexual harassment to be corroborated by other employees. *See, e.g., Hostetler*, 218 F.3d 798 (citing only to the depositions of the plaintiff and the supervisors to whom she complained in detailing her allegations of sexual harassment, and holding that material issues of fact existed to render summary judgment inappropriate).

12

Kornely ran into the restroom of Carson's, visibly upset. (Def.'s Facts ¶ 13.). She stated that she ran to the restroom in response to the busboys who "kept grabbing [her] and touching [her]." (Kornely Dep., at 65). Kornely also "open-handed slapped [a cook] on his chest" after the cook inappropriately grabbed her breasts while in the cooler of the restaurant. (Kornely Dep., at 55.) Finally, Kornely told Korellis when she resigned that she could not handle working at Carson's any longer, because the money was not worth the sexual harassment, that she was humiliated, and that nothing had been done about the co-workers grabbing her. (Plf.'s Additional Facts ¶¶ 2, 4.) These actions certainly "bespeak concern over [her co-worker's] actions and an unwillingness to tolerate further harassment," *Hostetler*, 218 F.3d at 807, and indicate a subjective belief that her environment was hostile. Accordingly, her testimony raises a genuine issue of material fact.

Second, the physical, forcible, and sexual nature of these incidents as detailed in the record could lead a reasonable jury to characterize Kornely's work environment as objectively hostile. *See Hostetler*, 218 F.3d at 809. Separating deeply offensive conduct that constitutes sexual harassment from conduct that is merely vulgar and mildly offensive is not always an easy task. *See id* at 807. On one side lie sexual assaults and hostile physical contact for which there is no consent. *Id.* On the other side lies "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Id.* (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995). A reasonable jury could conclude that the incidents alleged here represent the type of conduct that constitutes deeply offensive, unwelcome sexual touching. Kornely's co-worker Alfonso grabbed her buttocks approximately twenty times

13

and placed his genital area on or near her buttocks at least three times in a span of twenty weeks. (Plf.'s Additional Facts ¶ 8.) Skippo, the cook, approached her from behind and grabbed her breasts, prompting her to slap him. (Kornely Dep., at 55.) Finally, the "little man with a mustache" grabbed and kissed her on the back of her neck several times before she resigned. (Plf.'s Additional Facts ¶ 12.) Such actions are "not conduct that would be anticipated in the workplace, and certainly not in a family restaurant." *Hostetler*, 218 F.3d at 807-8. As such, the record indicates a genuine issue of material fact on the issue of her work environment's objective hostility.

B.   Establishment of Employer Liability

While employers are strictly liable for hostile environment sexual harassment by their supervisors, *see Shaw v. AutoZone, Inc.*, 180 F.3d 806, 810 (7th Cir. 1999) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)), they are liable for a co-employee's harassment only "when they have been negligent either in discovering or remedying the harassment." *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (citing *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997); *see also Adusumili v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998). In such cases, an employer's legal duty is discharged if it acts reasonably to discover and rectify acts of sexual harassment by its employees. *See Parkins*, 163 F.3d at 1035. Because it is unrealistic to expect management to be unaware of all improprieties committed by its low-level employees, notice or knowledge of the harassment is a prerequisite for liability. *See id.* The employer becomes liable for the co-worker's harassment if it "know[s] or should know

that wrongdoing is afoot and yet fail[s] to take steps reasonably designed to stop it." *Hostetler*, 218 F.3d at 811. Thus, the court must consider whether Kornely properly notified Carson's concerning her accusations of co-worker harassment and, if she did so, whether Carson's acted reasonably to prevent the continuation of such harassment. Upon a review of the entire record, the court finds that several issues of material fact remain concerning Carson's liability.

1. **Notice of Harassment**

To determine whether an employer had notice of harassment, "we first determine whether the employer has designated a channel for complaints of harassment." *Parkins*, 163 F.3d at 1035. If an employer establishes a "point person" to accept complaints, that person becomes the natural channel through which complaints should flow to management or ownership, and the employer can expect complainants to utilize this channel in the normal case. *Id.* If no "point person" is identified, or this person is not available or accessible, "an employer can receive notice of harassment from a 'department head' or someone that 'the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment.'" *Id.* (quoting *Young v. Bayer Corp.*, 123 F.3d 672 (7th Cir. 1997)).

To support its contention that summary judgment is proper because Kornely failed to follow Carson's printed "harassment" policy to the letter, Defendant cites *Shaw*, 180 F.3d at 811-13 (plaintiff's testimony about never seeing the employer's harassment policy was irrelevant because she signed an acknowledgment form); *Savino v. C.P. Hall Co.*, 199 F.3d 925, 934 (7th Cir. 1999) (employer not liable where the employee does not act reasonably to

15

report harassment); and *Hill v. American. Gen. Fin., Inc.*, 218 F.3d 639, 643-44 (7th Cir. 2000) (employee's subjective fears of confrontation, unpleasantness, or retaliation do not alleviate the duty to notify her employer of alleged harassment).

Though it does not claim that it has a "point person" for the reporting of sexual harassment among employees, Carson's nonetheless asserts that it has a "clearly designated channel" for employee complaints about workplace harassment. (Defendant's Memorandum in Support of Summary Judgment, at 9.) The policy of the company, outlined in the wait staff manual, was to funnel complaints to the owners through "employee communication forms" provided in the kitchen area of the restaurant. (Def.'s Facts ¶ 8, 9.) Kornely claims she never saw these forms and was not aware of their location in the kitchen, despite having signed a form acknowledging receipt of the wait staff manual (which included a blank form). (Kornely Dep. at 30-31, 80.) Kornely also claims that she did not discuss the manual or any sexual harassment policies when she was hired. (Kornely Dep., at 30-31.) Notably, however, language on the form suggests that Carson's "clearly designated channel" for voicing complaints was to first report a grievance to a restaurant manager. Specifically, the form states, "if you've voiced a grievance with a manager and the problem hasn't been remedied, then please take the time to fill out this form in detail . . . and drop it into the employee suggestion box." (Wait Staff Manual, at 12, Ex. 1 to Korellis Aff.) Reading the record in the light most favorable to Kornely, a reasonable factfinder could determine that Carson's channel for complaints was not "clearly designated," and that Kornely was not unreasonable in attempting to inform the restaurant managers of her complaints.

In any event, the existence of a "clearly designated channel" is only one factor to consider in determining whether Kornely acted reasonably to notify Carson's about the alleged harassment. Even if Carson's policy clearly designated a channel for complaints, Kornely may nevertheless withstand Carson's motion for summary judgment by "presenting evidence that she gave [Carson's] enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Parkins*, 163 F.3d at 1035 (citing *Zimmerman v. Cook County Sheriff's Dept.*, 96 F.3d 1017, 1019 (7th Cir. 1996)). This court must then seek to determine "whether [Kornely] reported the alleged harassment to anyone who had the authority to deal with the harassment or at least 'to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.'" *Parkins*, 163 F.3d at 1037 (quoting *Young*, 123 F.3d at 675).

Carson's asserts that Kornely failed to meet this evidentiary burden. Indeed, while Carson's emphasizes its established procedures for reporting sexual harassment complaints, the thrust of its defense is that Kornely did not give any notice whatsoever to either Sandra or Korellis. On this issue, however, the record clearly reveals a question of material fact unsuitable for disposition at this stage. Kornely testified to several instances of direct interaction with Carson's management that could have alerted Carson's to some probability that a hostile environment existed. First, Kornely claims that, on August 28, she specifically informed Sandra that the busboys were "pigs" who "kept grabbing me and touching me," and that Sandra responded with the suggestion that she "just stay away from them." (Kornely Dep., at 65; Plf.'s Additional Facts ¶ 11.) Second, Kornely claims that Korellis "confronted"

her the day after her contact with Skippo in the cooler, laughing at her because her hand print was still on Skippo's chest. (Kornely Dep., at 56-57.) Third, Kornely allegedly complained to Korellis on September 8, 1998, about general harassment in the restaurant. (Plf.'s Additional Facts ¶ 12). Given the managerial positions occupied by Sandra and Korellis, a trier of fact could surely conclude that Kornely's allegations constituted sufficient notice to Carson's.[3] The fact that everyone at Carson's involved in these incidents flatly denies they ever happened underscores the presence of an issue of material fact on this issue. (Def.'s Facts ¶¶ 5, 7, 8; Def.'s Response to Additional Facts ¶ 12.) The outcome of this case will consequently turn on issues of witness credibility—that is, whose story is more "believable"—the determination of which is the exclusive province of a fact finder at trial.

2. **Response to Notification of Harassment**

In cases of co-employee harassment, an employer "will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures once apprized of the harassment." *Hostetler*, 218 F.3d at 809. The record reveals that the only action Carson's took in response to her several complaints of sexual harassment was to move her to a more profitable area of the restaurant for one evening. (Kornely Dep., at 65-66.) Whether this is an appropriate remedial measure under the circumstances is an issue for a fact finder

---

[3] In fact, in their respective affidavits, both Sandra and Korellis stated that they were "specifically instructed that if an employee ever lodged a complaint or made an allegation of an unwelcome sexual advance or harassment by co-workers, supervisors or patrons, that such allegation be immediately investigated and reported to Carson's corporate office for review by Donna Carson Giannis."

18

at trial.

## CONCLUSION

For the foregoing reasons, Carson's motion for summary judgment (Doc. No. 14-1) is denied.

ENTER:

Dated: December 4, 2000

REBECCA R. PALLMEYER
United States District Judge